# In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-18-00443-CR
_____

### CAMERON KEITH BROWN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 17-02-01883-CR**

### MEMORANDUM OPINION

Cameron Keith Brown appeals his first-degree felony conviction for the offense of continuous sexual abuse of a child. A jury convicted Brown for the repeated sexual assault of his thirteen-year-old daughter, M.G., between November 2016 and January 2017.[1] The jury assessed punishment at life in prison, and the trial

_____

[1] To protect the privacy of the victim, we refer to her and her family members using their initials. *See* Tex. Const. art. I, § 30(a)(1) (granting victims of crime "the

1

court sentenced Brown accordingly. In two issues, Brown challenges the trial court's admission of certain evidence of other sexual acts as testified to by a previous girlfriend, T.F. Specifically, Brown asks: (1) whether the trial court abused its discretion when it overruled his relevancy objection and allowed the State to elicit testimony regarding "other crimes, wrongs, or acts" that were not sufficiently similar to the charged offense; and (2) whether the trial court abused its discretion when it overruled his objection and allowed the State to elicit testimony regarding "other crimes, wrongs, or acts" when the probative value was clearly outweighed by the danger of unfair prejudice. We affirm the trial court's judgment.

## I. Background

A.G., who is M.G.'s mother, and Brown had a dating relationship, which began when A.G. was sixteen or seventeen and lasted for about a year and a half. During that relationship, A.G. became pregnant and gave birth to M.G. in August of 2003. Brown questioned M.G.'s paternity and requested a paternity test before M.G.'s birth, but one was not performed. A.G. raised M.G. alone, and Brown was not a part of M.G.'s life from infancy. Around August of 2016, M.G. decided she

right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]")

2

wanted to meet Brown and that side of her family, so A.G. reached out to Brown via social media. Brown responded that he wanted to get to know M.G. and spoke with M.G. by phone several times before they met in person.

Eventually, M.G. and A.G. met Brown at a local restaurant. Following the initial meeting, M.G. and A.G. had dinner with Brown and his parents a few times between August 2016 and November 2016. A paternity test ultimately confirmed Brown was M.G.'s father.

In November 2016, Brown's parents planned to go on a cruise and decided to take M.G. with them. Brown was not supposed to go on the trip, but at the last minute, his schedule cleared, and he decided to go. M.G. testified that Brown began performing various sexual acts with her while on the cruise, including sexual intercourse and oral sex.

Once they returned from the cruise, A.G. had a standard possession order put in place which gave Brown access to M.G. every Thursday and every other weekend. Additionally, Brown began paying child support. During this time, Brown and M.G. communicated by text and via What's App because they could delete messages sent through the app. M.G. testified they used What's App for communicating about sexual things. M.G. also testified that it was Brown's idea to use the code word "gummy bears" for sex.

3

A.G. testified that she noticed strange texts between M.G. and Brown in late January of 2017 and that they used What's App, but she did not initially read through all the messages. However, once A.G. read the messages in more detail and determined they were inappropriate, she contacted the police on February 2nd and turned M.G.'s phone over to the police. A.G. testified that she questioned M.G. about the texts and M.G. asked her what it would mean if M.G. and Brown had had sex, but then M.G. denied that they had had sex. When M.G. learned that her mother had given her phone to police, M.G. told her mother about the abuse.

M.G. testified that she and Brown engaged in sexual activity anytime they were alone together, and it happened "so many times" that she "lost count." Brown worked offshore and he did not have a home, so while in town, he stayed with his parents. A recent flood made their house uninhabitable, however, so it was not uncommon for Brown to rent rooms at hotels in November and December of 2016. M.G. testified that the sexual encounters occurred at these hotels and in Brown's truck in public parking lots.

M.G. testified that Brown never used a condom but provided her with Plan B pills after they had sex. When asked to describe some of these sexual encounters on direct examination, M.G. testified that Brown had her straddle the console in the truck with her legs on either side. M.G. also described an incident where Brown

4

choked her and pulled her hair. She explained that Brown did not try to strangle her, but his hands were wrapped around her neck.

During their opening statement, the defense addressed false allegations, referenced Brown's large body size, and focused on the fact that the sexual misconduct allegedly occurred in a very small pickup truck in public places which the defense asserted would be impossible. The defense implied that Brown lacked the opportunity due to the public locations. Similarly, during cross-examination of various witnesses, the defense focused on the implausibility of these occurrences, insinuating the allegations were fabricated and challenged M.G.'s credibility. They pointed to Brown's large build, the fact that the truck was small, the truck's windows were not tinted, the incidents allegedly occurred in public parking lots, there were no marks on M.G.'s neck and that M.G. never mentioned Brown pulling her hair or choking her to her counselor.

To rebut the defense's fabrication theory and the implausibility of these assaults occurring in the truck and in public parking lots, the choking and hair pulling, the State sought to introduce the testimony of Brown's former girlfriend, T.F. During a hearing outside the jury's presence, the defense argued that T.F.'s testimony was not relevant in a child sex abuse case, because T.F. is an adult. The State argued that the defense made much of the choking, hair pulling, and sex in a

vehicle, and T.F. could testify that that is how Brown had sex and that they also had sex in vehicles in the same position as M.G. described. The trial court noted that the State wanted to rebut the defense's extensive cross-examination about the small truck and Brown's large build.

The defense countered that their cross was in rebuttal to the State's case in chief. The defense maintained its Rule 404 objection, which it understood was overruled by the trial court. The trial court also noted upon balancing, there was a lot of questioning about Brown being a larger man and it would be difficult for him to have sex in a vehicle of any sort and the truck cab was small. Therefore, the trial court allowed the evidence to come before the jury. The court stated it would limit the State to testimony regarding sex in a car, in a public place, and the sexual position.

The State also explained that it wanted to get into the fact that when Brown and T.F. had sex, he choked her and pulled her hair, because the defense "seemed to make that some ridiculous or preposterous assertion." The defense argued that it had not opened the door but merely tried to impeach M.G. with prior inconsistent statements. The trial court noted that while T.F. was an adult and the sex was consensual, it would allow T.F.'s testimony for the limited purpose of rebutting the defense's theory. The court ruled the choking and hair pulling would come in along

6

with the public place and similarity of the position. The defense objected based on Texas Rules of Evidence 401, 402, 403, and 404 and asked for a contemporaneous limiting instruction and one in the charge.[2]

T.F. testified that she and Brown began dating in September 2014. After they broke up, they continued to have an "on and off" relationship. T.F. knew who M.G. was from Brown, but they did not date while Brown had contact with M.G. between August 2016 and January 2017. After Brown was charged in this case, he and T.F. reunited, but she did not know the details of the allegations against him. T.F. testified that Brown choked her, covered her mouth, and pulled her hair during sex, but the choking did not always leave physical markings on her neck. T.F. said they engaged in sex in her car, a four-door Corolla, in parking lots, on the street, and in neighborhoods. T.F. described having sex with Brown in her vehicle in the same position M.G. described, with her legs straddling the console. Following her testimony, the trial court read a limiting instruction to the jury.[3]

---

[2] At trial, Brown additionally argued that it did not have proper notice under Rule 404 and mentions it in passing in his appellate brief in the statement of facts; however, Brown does not raise lack of notice as an issue for our consideration on appeal.

[3] The trial court instructed the jury as follows:

> You are instructed if there is any testimony before you in this case regarding the Defendant having committed another offense or bad act, other than the offense alleged in the Indictment in this case, you cannot

7

The State's crime scene investigator testified they tested the interior of Brown's truck but did not detect the presence of semen. An investigator who examined Brown's computer testified he found Google searches for how to delete What's App messages. Other evidence admitted at trial included hundreds of pages of text messages and What's App messages between Brown and M.G., a report of the results of the forensic computer search, various hotel receipts, photographs of locations where M.G. alleged the assaults occurred, and photographs of Brown's truck.

Other witnesses included M.G.'s forensic interviewer, M.G.'s counselor, and the Sexual Assault Nurse Examiner ("SANE"). The SANE testified that she did not find any evidence of trauma during her exam, but that is not uncommon as that area heals quickly and the last assault occurred ten to fourteen days before the exam. A defense physician expert countered her testimony and testified that based on M.G.'s

---

consider said testimony for any purpose unless you find and believe beyond a reasonable doubt the Defendant committed such other act or offense or bad act, if any; and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, if any, in connection with the offense alleged against him in the Indictment in this case and for no other reason.

The court's charge to the jury included the same limiting instruction.

8

allegations, he would not have expected a completely normal exam, and "there is no objective forensic evidence to support the allegations of sexual assault in this case." M.G.'s counselor testified that M.G. was still in counseling at the time of trial and had been through more sessions than most children. The counselor also outlined the symptoms M.G. reported. The counselor testified that M.G. mentioned Brown choking her and pulling her hair during a sex act in his truck. The forensic interviewer described M.G.'s allegations and testified that M.G. provided sensory details and reported that she had sex with Brown inside his truck, among other places.

The jury convicted Brown of continuous sexual abuse of a child and sentenced him to life in prison. Brown timely appealed.

## II. Standard of Review

We review a trial court's decision on the admission of evidence under Rule 404(b) for an abuse of discretion. *See Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016); *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "The trial court's ruling on whether extraneous-offense evidence was admissible to rebut a defensive theory should be upheld if it is within the zone of reasonable disagreement." *Dabney*, 492 S.W.3d at 318. A trial court's ruling is generally considered to fall within this zone if the evidence establishes "1) an extraneous

transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz*, 279 S.W.3d at 344. If a trial court's evidentiary ruling is correct under any applicable theory of law, we do not disturb it even if the trial judge articulates an incorrect reason for the correct ruling. *See id.*

### III. Analysis

### A. Applicable Evidentiary Rules

Evidence having "any tendency to make a fact more or less probable than it would be without the evidence; and [ ] the fact is of consequence in determining the action" is relevant. Tex. R. Evid. 401. Generally, relevant evidence is admissible, and irrelevant evidence is inadmissible. *See id.* 402. However, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id.* 403. Typically, evidence of a person's character is inadmissible to prove that a person acted in conformance with that trait on a particular occasion. *Id.* 404(a)(1). However, subject to Rule 412, a defendant in a criminal case may offer evidence of a victim's character trait, and if admitted, the prosecutor may offer evidence to rebut it. *Id.* 404(a)(3)(A).

10

Likewise, evidence of other crimes, wrongs or acts is inadmissible to prove that a person acted in conformance with that trait on a particular occasion. *Id.* 404(b)(1). Although this evidence may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* 404(b)(2).

**B. Issue One: Relevance**

In his first issue, Brown contends the trial court abused its discretion in overruling his relevancy objection and allowing an ex-girlfriend to testify regarding other sexual acts that were not substantially similar. Rebuttal of a defensive theory is one of the permissible purposes for which relevant evidence may be admitted under Rule 404(b). *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). The Court of Criminal Appeals has explained extraneous-offense evidence is relevant for noncharacter conformity and can be admitted to rebut a defensive theory presented in the defense's opening statement or during cross-examination. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (addressing defensive theory presented in opening statement as opening the door to extraneous offense information); *Powell v. State*, 63 S.W.3d 435, 438–40 (Tex. Crim. App. 2001) (explaining that defense's opening statement asserting he lacked opportunity to molest the complainant under the charged circumstances opened the door to

11

admission of extraneous-offense evidence that defendant molested others under almost identical circumstances to rebut the defense's lack of opportunity defensive theory); *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1996) (op. on reh'g) (noting admissibility of extraneous offenses to rebut defensive theories raised by State's witness during cross-examination).

In support of his argument that other acts T.F. described were not substantially similar, Brown focuses on the fact that T.F. is an adult, and the sexual acts she described did not involve a crime but rather consensual conduct. There is no requirement that evidence be of a criminal offense or even misconduct to fall within Rule 404(b)'s purview. *See Bishop v. State*, 869 S.W.2d 342, 344–45 (Tex. Crim. App. 1993) (explaining evidence of defendant's sexual proclivities and practices qualified as "other acts" under Rule 404(b)). Evidence of extraneous offenses or other acts may be admitted to rebut a defensive theory that he is the innocent victim of a "'frame-up' by the complainant or others." *Wheeler v. State*, 67 S.W.3d 879, 887 n.22 (Tex. Crim. App. 2002); *Dennis v. State*, 178 S.W.3d 172, 177 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

We disagree with Brown's argument that the evidence was irrelevant because the extraneous acts were not substantially similar. In cases where the evidence is admitted to rebut a defensive theory, the same exacting standard of similarity of

evidence admitted to show the defendant's "system" or "modus operandi" is not required.[4] *See Dennis*, 178 S.W.3d at 178–79. The trial court explained that T.F.'s testimony was admissible for the purpose of rebutting a defensive theory.

Brown challenged M.G.'s credibility regarding claims that he choked her and pulled her hair during a sexual encounter. The defense further challenged her credibility regarding allegations that Brown assaulted her in his truck, specifically questioning her about how large Brown was, how small his truck was, the fact that the windows were not tinted, and that these incidents allegedly occurred in public parking lots. The defense made M.G.'s credibility a key issue in the case through its opening statement and extensive cross-examination of multiple witnesses questioning the plausibility of her allegations. Although Brown's ex-girlfriend, T.F., testified regarding sexual acts she and Brown engaged in as adults, she described Brown's propensity to pull her hair and choke her during sex. Additionally, T.F. testified that Brown had sex with her on multiple occasions inside her small vehicle in parking lots and in a position almost identical to the one M.G. described.

The trial court noted that despite the fact that T.F. was an adult and the sex was consensual, she would allow the testimony for the limited purpose of rebutting

---

[4] The trial court noted that the choking and hair pulling "seem[ed] to be kind of a signature."

the cross-examination. The trial court could have reasonably concluded that T.F.'s testimony was admissible to rebut Brown's defensive theory that M.G. lacked credibility, fabricated the allegations, and that Brown lacked an opportunity to commit the abuse, and thus the evidence had relevance apart from its tendency to show Brown's character and that Brown acted in conformity therewith. *See* Tex. R. Evid. 404(b); *Montgomery v. State*; 810 S.W.2d 372, 377 (Tex. Crim. App. 1990) (op. on reh'g); *Self v. State*, 860 S.W.2d 261, 263 (Tex. App.—Fort Worth 1993, pet. ref'd) (explaining that when a defendant accused of sexually assaulting a child challenges the child's credibility, proof of similar acts may be admissible under 404(b) to rebut the credibility challenge). Based on the record in this case, the trial court could have reasonably concluded that the defense's opening statement and cross-examination opened the door to this evidence. *See Bass*, 270 S.W.3d at 563; *Ransom*, 920 S.W.2d at 301. We overrule Brown's first issue.

## C. Issue Two: Probative Value Substantially Outweighed by Prejudice

In his second issue, Brown argues that even if relevant, the trial court erred by allowing T.F.'s testimony because its probative value was substantially outweighed by the danger of unfair prejudice. Determining evidence may be relevant does not end our inquiry, and we must now determine whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See*

14

*Montgomery*, 810 S.W.2d at 377–80; *see also* Tex. R. Evid. 403. When conducting

a 403 analysis, a court must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). "Rule 403

favors the admission of relevant evidence" carrying with it the presumption that

relevant evidence is more probative than prejudicial. *Davis v. State*, 329 S.W.3d 798,

806 (Tex. Crim. App. 2010). Rule 403 "envisions exclusion of evidence only when

there is a '*clear disparity* between the degree of prejudice of the offered evidence

and its probative value.'" *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App.

2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001); *Joiner

v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992) (emphasis added)).

T.F.'s testimony that Brown consensually engaged in sex with her in a

position nearly identical to that described by M.G., in a small car in numerous public

places, including parking lots, directly rebutted the defensive theories that Brown

lacked the opportunity to engage in such activity and that M.G.'s claims were

15

implausible or lacked credibility. Therefore, such evidence was highly probative in rebutting Brown's defensive theory that it was implausible for him to engage in a similar sexual encounter in a small vehicle because of his large build and in rebutting a lack of opportunity because of the public locations. *See e.g., Buxton v. State*, 526 S.W.3d 666, 690–91 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (noting extraneous evidence that defendant abused another child alone and in the presence of others rebuts both defensive theories). While there may have been some chance that the evidence would impress the jury in some irrational way, the fact that T.F.'s testimony involved consensual acts and the trial court limited the scope of the testimony reduced this potential. The record reveals that T.F.'s testimony did not require an inordinate amount of time to develop.[5] Finally, the State's need for the evidence was great, as it directly rebutted several defensive theories that no other evidence could, including M.G.'s lack of credibility, Brown's lack of opportunity, and the implausibility of the locations and manner of the assaults. On balance, we conclude there is not a "clear disparity" between the prejudicial impact of the evidence and its probative value. *See Hammer*, 296 S.W.3d at 568. The trial court's admission of T.F.'s testimony fell within the zone of reasonable disagreement and

---

[5] The record shows T.F.'s testimony lasted approximately twelve minutes and spanned less than ten pages in the transcript.

16

therefore, did not constitute an abuse of discretion. *See Wheeler*, 67 S.W.3d at 889; *McCulloch v. State*, 39 S.W.3d 678, 681–82 (Tex. App.—Beaumont 2001, no pet.) (weighing 403 factors and concluding evidence of other "acts" was relevant and probative value not substantially outweighed by danger of unfair prejudice).

## IV. Conclusion

We hold the trial court did not abuse its discretion in determining the evidence of other "acts" was relevant and that the danger of unfair prejudice did not substantially outweigh the probative value in this case. We affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on February 3, 2020
Opinion Delivered April 22, 2020
Do Not Publish

Before Kreger, Horton and Johnson, JJ.

17